## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| **EMANUEL LOLLIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No. 21-cv-4212** |
| ) | |
| **HEATHER HOGAN,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## <u>ORDER AND OPINION</u>

Plaintiff Emanuel Lollis, proceeding *pro se* and detained in the Rushville Treatment and Detention Facility ("Rushville"), alleges that Defendants Heather Hogan, Michelle Shults, Twila Batterton, Sara Watson, Lucinda McKenna, Lisa Brown, and Mindy Griffin violated his Fourteenth Amendment rights when they refused to respond when he reported dizziness, headaches, and shortness of breath; refused to monitor his blood pressure; and did not notify a doctor when his blood pressure numbers were high from August 2021 through January 2022. (Docs. 8 and 10).

This matter is now before the Court on Defendants' Motion for Summary Judgment under Federal Rule of Civil Procedure 56 and Local Rule 7.1(D) (Doc. 60); Plaintiff's Response (Doc. 65); and Defendants' Reply (Doc. 66). For the following reasons, Defendants' Motion for Summary Judgment is GRANTED.

## MATERIAL FACTS

### *Parties*

Plaintiff Emanuel Lollis is a detainee at Rushville. Defendant Heather Hogan is a registered nurse and served as the Director of Nursing at Rushville. During the relevant time period, Defendants Lisa Brown, Michelle Shults, Mindy Griffin, and Lucinda McKenna were employed

1

as licensed practical nurses ("LPN") at Rushville. Defendants Twila Batterton and Sara Watson were employed as registered nurses ("RN").

***Plaintiff's Medical Care***

Prior to entering Rushville on March 29, 2017, Plaintiff had cholesterol and back problems but had not been diagnosed with high blood pressure or hypertension. Plaintiff first received a high blood pressure or hypertension prescription approximately two years before his July 2023 deposition. Plaintiff has never experienced a stroke, heart attack, or cardiac arrest.

Plaintiff does not have a device to check his blood pressure, but he claims to know when it is high. (Doc. 60-1 at 22:22-23:1). Plaintiff does not know what his blood pressure numbers are unless he goes to the Health Care Unit ("HCU") and has a monitor or cuff placed on him. *Id.* at 52:15-19. To accurately determine his blood pressure, Plaintiff contacted Rushville staff to check it for him. *Id.* at 23:18-22. Medical staff at Rushville checked Plaintiff's blood pressure manually and by using a machine and blood pressure cuff. *Id.* at 23:23-24:2. Plaintiff claims he suffered damage to a heart valve because Defendants did not check his blood pressure for a while. *Id.* at 98:19-99:2.

On July 10, 2019, an LPN noted Plaintiff's complaints of chest pain near his shoulder and shortness of breath, but the LPN observed no signs or symptoms of shortness of breath. Plaintiff's blood pressure was 120/79.

On August 9, 2019, Defendant Watson noted Plaintiff complained of chest pain, but his vital signs were within normal limits. Defendant Watson also noted Plaintiff received an electrocardiogram ("EKG"), but it showed no changes from his previous EKG. On August 18, 2019, Plaintiff complained of increased blood pressure, a headache, and chest pain. Plaintiff's blood pressure was 162/100; his heart sounded within normal limits; an EKG was performed; and

no acute distress was noted. A doctor prescribed Plaintiff 0.1mg of Clonidine, a medication to lower blood pressure, to be taken by mouth daily.

On September 1, 2020, an LPN noted Plaintiff requested a blood pressure check due to "pressure at top of eyes." (Doc. 60-3 at p. 73). Plaintiff's blood pressure was 122/84.

On August 15, 2021, an LPN noted Plaintiff reported, "I was seeing spots," but "[t]hey went away." *Id.* at p. 68. Plaintiff's blood pressure was 137/91. On August 20, 2021, Plaintiff complained of "chest pain," and his blood pressure was 128/82.

Plaintiff alleges a nurse refused to take his blood pressure when he reported that he was dizzy on August 21, 2021, and September 2, 2021. Plaintiff's medical records do not show he was seen by a health care provider on either August 21, 2021, or September 2, 2021.

On September 20, 2021, Plaintiff went to the HCU complaining of chest pain; an EKG was obtained; and his blood pressure was 128/83. On September 23, 2021, an LPN noted that Plaintiff requested a blood pressure check, and his blood pressure was 154/98. The LPN also noted Plaintiff asked to see a doctor to discuss blood pressure and family history of heart disease.

On September 24, 2021, Plaintiff went to the HCU complaining of chest pain and dizziness. His blood pressure was 142/91. Plaintiff informed the LPN his father died of a myocardial infarction ("MI") in his fifties. Plaintiff was placed on the doctor's line to discuss further testing and blood pressure medications. When Plaintiff left the HCU, he was in no distress. Three hours after seeing the LPN, Plaintiff requested a blood pressure check during med line, and his blood pressure was 130/94.

On September 26, 2021, an LPN noted Plaintiff complained of a headache, chest pain, and dizziness. Plaintiff's blood pressure was 153/96, and he was in no apparent distress. The LPN noted a plan to check Plaintiff's blood pressure daily for five days.

3

On September 27, 28, 29, 30, and October 1, 2, 3, 4, 5, 6, and 7, 2021, Plaintiff's blood pressure was 138/89, 153/82, 180/92, 132/52, 140/90, 122/78, 118/88, 112/92, 132/96, 158/86, and 120/90, respectively.

On September 30, 2021, a doctor prescribed Plaintiff 20mg daily of Lisinopril, a medication used to treat hypertension. The doctor ordered daily blood pressure and pulse checks for one week.

Plaintiff alleges nurses ignored his symptoms and refused to take his blood pressure on October 7, 2021; however, Plaintiff's medical records show that on October 7, 2021, his blood pressure was 120/90 but 140/92 after it was re-checked. (Doc. 60-2 at p. 10).

Plaintiff alleges his blood pressure was elevated on October 9, 17, 18, and 19, 2021. A doctor ordered nurses to regularly check Plaintiff's blood pressure and notify him if it was elevated.

On October 10, 2021, Plaintiff's blood pressure was 152/90 but 146/98 when re-checked. On October 11 and 12, 2021, Plaintiff's blood pressure was 144/82 and 150/88, respectively.

On October 17, 2021, an LPN noted Plaintiff complained of a headache and feeling his heartbeat behind his eyes. Plaintiff's blood pressure was 161/105 after sitting for ten minutes. The LPN called a doctor and received an order for 0.1mg of Clonidine. The doctor requested that Plaintiff's blood pressure be checked again in thirty minutes. Plaintiff's blood pressure was 156/99 when it was rechecked. Plaintiff expressed concern about his high blood pressure and was added to the doctor's line. Approximately four hours later, an RN checked his blood pressure and noted it was 156/88.

On October 18, 2021, an RN noted Plaintiff's blood pressure was 146/96. On October 19, 2021, a doctor noted Plaintiff's blood pressure was 139/91, and Plaintiff reported a history of heart disease in his family. A doctor observed Plaintiff's blood pressure was mildly high, assessed blood

pressure and cardiac risk, planned an EKG at Plaintiff's normal bedtime and blood pressure checks twice daily for a month, added Plaintiff to the hypertension clinic, and prescribed Plaintiff 5mg daily of Norvasc for six months to treat high blood pressure.

On October 20, 2021, Plaintiff's blood pressure was 115/80. On October 21, 2021, Plaintiff refused a blood pressure check. On October 22, 23, and 24, 2021, Plaintiff's blood pressure was 145/90, 148/82, and 128/89, respectively.

Plaintiff alleges he reported shooting pains on his left side on October 25, 2021. An RN noted Plaintiff complained of chest pain, and his blood pressure was 169/112. The Medical Director, Collegial Review, and Defendant Hogan were notified. Plaintiff was sent to Sarah D. Culbertson Memorial Hospital the same day. At the hospital, Plaintiff informed the doctor he had chest pain, but the doctor noted Plaintiff was not acting as if he was in pain. Plaintiff's blood pressure was 161/99; he was in no distress; his pulse oximeter reading was within a normal range; his heart rate and rhythm were normal; and he did not have acute cardiopulmonary disease. As a result, Plaintiff was discharged from the hospital. That evening, Plaintiff's blood pressure was 145/93.

On October 26, 2021, a doctor prescribed Plaintiff 25mg of Metoprolol, a medication for high blood pressure, daily for six months. On October 26, 27, 28, 29, and 30, 2021, Plaintiff's blood pressure was 150/93, 132/81, 144/100, 138/83, and 166/90, respectively.

Plaintiff alleges a nurse refused to see him despite his reported symptoms on November 9, 2021.

Every morning from November 1 through November 18, 2021, Plaintiff refused the 25mg of Metoprolol the doctor prescribed. Plaintiff's blood pressure was checked, with readings of

132/84, 152/92, 142/89, 142/97, 110/75, 126/80, 147/86, 146/82, 139/91, 160/80, 171/90, 138/93, 123/85, 141/82, 110/83/ 135/96, 134/99, and 148/80, respectively.

On November 16, 2023, Defendant Brown noted Plaintiff refused to come for sick call.

Plaintiff alleges he passed out on November 19, 2021. He was found lying face down on the floor trying to get up when an RN arrived. Plaintiff's blood pressure was 173/124 and then 186/102 when taken manually. Plaintiff denied having chest pain, stated he felt dizzy, and was able to sit up on his own and ambulate back to his room for standby assistance. When asked about his daily medications, Plaintiff told the RN, "I have been taking my night ones but unless they wake me up in the morning[,] I have not been taking them." (Doc. 60-3 at p. 55). A doctor changed Plaintiff's daily dose of Metoprolol from morning to night and prescribed 0.2mg Clonidine. Later that day, Plaintiff blood pressure was 165/92, and the RN administered the second dose of Clonidine. Plaintiff's blood pressure was 146/93 in the evening.

On November 20, 2021, Plaintiff was prescribed Clonidine 0.1mg by mouth. That evening, Plaintiff's blood pressure was 168/120. On November 21, 2021, Plaintiff's blood pressure was 162/88 in the morning and 157/95 in the evening. Plaintiff complained of a headache and dizziness and was given Tylenol. Plaintiff requested that his blood pressure be taken, and it was 158/91. Plaintiff stated he had nose bleeds for the past two days and was told to sign up for nurse sick call.

Plaintiff alleges he passed out on November 22, 2021, a doctor was notified, and medication was administered. Shortly after midnight, Plaintiff reported blurred vision, dizziness, pressure on the left side of his head, and nausea. The nurse checked Plaintiff's vital signs, including his blood pressure of 173/82, and noted Plaintiff had no shortness of breath or chest pain. A doctor was notified of his condition and ordered Plaintiff to be placed on the doctor line that day.

At 9:00 a.m. on November 22, 2021, the doctor saw Plaintiff for a follow-up visit for his blood pressure and a medication adjustment. Plaintiff's blood pressure was 139/86; he was alert and oriented; and he had no acute distress. The doctor discontinued Plaintiff's 25mg Metoprolol prescription, increasing it to 50mg extended release to be taken by mouth at bedtime for ninety days. That evening, Plaintiff's blood pressure was 179/90.

At 2:30 a.m. on November 23, 2021, Plaintiff came to the HCU to request a blood pressure check. Plaintiff complained of a headache, dizziness, and blurred vision, but had no shortness of breath or chest pain. Plaintiff's blood pressure was 182/94.

Plaintiff saw the doctor at 7:50 a.m. on November 23, 2021. His blood pressure was 146/90. Plaintiff was alert and oriented, had no acute distress, and his EKG was normal. Plaintiff's blood pressure was checked twice that evening and was 151/73 and 136/96, respectively.

Shortly after midnight on November 24, 2021, Plaintiff complained of a headache, dizziness, nose bleeds, blurred vision, tiredness, a metallic taste in his mouth, and numbness on the right side of his mouth. Plaintiff was alert and oriented, had no shortness of breath or chest pain, and his blood pressure was 172/100. The nurse's treatment plan included an EKG and a referral to the Medical Director.

At 8:00 a.m. on November 24, 2021, a doctor ordered an EKG due to Plaintiff's increased blood pressure. At 8:40 a.m., the doctor was notified of Plaintiff's EKG, and Plaintiff was referred for a cardiac consultation. Plaintiff's blood pressure was checked twice that evening and was 133/89 and then was 149/93 two hours later.

In the evening on November 25, 2021, Plaintiff's blood pressure was checked twice and was 132/86 and then was 179/97 about ninety minutes later. On November 26, 27, and 28, 2021, Plaintiff's blood pressure was 149/98, 134/90, and 164/101, respectively.

On November 29, 2021, Plaintiff saw the doctor for a follow-up examination. Plaintiff was alert and oriented, had no acute distress, and his blood pressure was 136/105, then 130/105, and finally 131/93 during the visit. Plaintiff complained of back pain and expressed concern about myocardial infarction due to his family history. The doctor assessed Plaintiff as having increased blood pressure secondary to low back pain. The doctor referred Plaintiff to a cardiologist, prescribed Tramadol 50mg and Metoprolol 50mg extended release twice daily, and checked his blood pressure twice a day for thirty days. Plaintiff's cardiology referral was approved on November 30, 2021.

From December 1, 2021, through December 31, 2021, Plaintiff's blood pressure was checked at least twice daily, with two exceptions. On December 1 and 2, 2021, Plaintiff's blood pressure was checked in the morning and evening and read 138/84, 143/98, 140/80, and 131/85, respectively. On December 3, 2021, Plaintiff's blood pressure was checked three times, reading at 153/93 at 1:39 a.m., 144/78 later in the morning, and 137/84 that evening. On December 4, 6, 7, 9 10, and 11, Plaintiff's blood pressure was checked each morning and evening and read 128/76, 122/84, 141/85, 133/85, 142/90, 152/87, 124/82, 144/89, 122/78, 122/89, 153/90, and 139/73, respectively.

On December 5 and 8, 2021, Plaintiff refused to have his blood pressure checked in the morning, although it was checked in the evening on December 8, 2021, and read 184/102.

On December 12, 2021, Plaintiff's blood pressure was read in the morning as 145/81. In the evening it first read 160/110, then 169/106, and then after fifteen minutes, at 185/118. After Plaintiff's three evening blood pressure readings, a nurse called the doctor, who ordered Plaintiff to take 0.2mg of Clonidine and have his blood pressure rechecked in an hour; if his diastolic was over 90, the doctor directed Plaintiff to take another 0.2mg of Clonidine. That evening, Plaintiff

was given Clonidine and told to return in an hour for a recheck. Plaintiff returned to the HCU less than an hour later complaining of chest pains and was given an EKG, which was normal. A nurse called the doctor again regarding Plaintiff's blood pressure, and the doctor directed the nurse to give Plaintiff an intramuscular dose of 2mg Lorazepam, an antianxiety medication, and said he would see Plaintiff the next day. The nurse gave Plaintiff a dose of Lorazepam but not the second dose of Clonidine because Plaintiff's diastolic reading was 80. That evening, Plaintiff's blood pressure was rechecked three times, first reading 177/104, then 185/118, and finally 160/80.

On December 13, 2021, Plaintiff alleges he passed out, but a nurse refused to provide any medical care. At 2:30 a.m., Plaintiff complained of chest tightness, dizziness, and nausea, sore throat, and mucus in his throat. Plaintiff's blood pressure was checked and read 143/83, and he was scheduled to see a doctor. Later that morning, Plaintiff's blood pressure was checked and read 120/66. When Plaintiff saw the doctor in the evening, he reported dizziness and tiredness since starting Gabapentin, an antiseizure medication, and asked to discontinue the medication. The doctor observed no apparent distress, educated Plaintiff on the side effects of Gabapentin, and prescribed 300mg of Gabapentin for two months and 600mg at bedtime for a month, with a follow-up appointment in two weeks. That evening, Plaintiff's blood pressure was checked and read 188/89.

Later in the evening on December 13, 2021, security staff called a nurse to Plaintiff's housing unit, where he was found sitting in a chair crying. Plaintiff had allegedly been standing by the microwave, fell backwards, and his head on the floor. The nurse checked Plaintiff's eyes, and his pupils were equal in size (2mm), round, reactive, and light-sensitive. Plaintiff's hand grips and leg strengths were checked and found to be equal, he was fully alert and oriented, and no redness or swelling was noted to the back of his head. Plaintiff denied any loss of consciousness,

9

nausea, or vomiting; his blood pressure was 162/78, with a pulse of 64; his temperature was 98 degrees; the doctor was notified; and Plaintiff was monitored through the night.

Shortly after midnight on December 14, 2021, Plaintiff was checked and found to be alert and oriented, with equal hand grasp strength, clear speech, normal pupils/eyes, a steady gait, no nausea or vomiting, blood pressure of 159/79, pulse of 70, and temperature of 97.4 degrees. Later that day, Plaintiff was called to the HCU to discuss his ongoing health concerns with Defendant Hogan. During this visit, Plaintiff was alert and oriented, his nervous system was normal, lungs clear, heart tones strong, and pupils round and reactive. Plaintiff reported feeling a "little better" and had no current complaints but expressed concern about having a stroke or heart attack. Defendant Hogan discussed his prior labs, EKGs, and doctor's visits; Plaintiff was informed he would see the onsite doctor on Monday; and he was encouraged to alert nursing staff immediately with any issues.

On December 14, 15, 16, 17, 18, and 20, 2021, Plaintiff's blood pressure was checked at least each morning and evening, reading 156/92 and 165/79; 126/88 and 160/70; 160/80 and 170/80 manually, with 146/112 automatic; 142/90 and 148/90; 128/88 and 160/80; and 130/86 and 138/94, respectively. On December 19, 2021, Plaintiff's blood pressure was checked once in the morning and twice at night, with readings of 140/90 manual and 134/95 automatic in the morning and 150/80 and then 160/80 in the evening.

On December 21, 2021, Plaintiff's blood pressure was 160/82 when he saw the doctor. The doctor assessed his lower back pain, ordered a low bunk for one year, reported awaiting a cardiology consultation, and referred Plaintiff to psychiatry, but he refused.

Plaintiff's blood pressure was checked each morning and evening from December 21-24, 2021, with readings of 160/82 and 152/79; 128/84 and 166/90 in right arm, then 160/80 in his left

10

arm; 126/88 and 158/90; and 140/86 automatic with 148/75 manual, then 130/80 and 130/60 manual.

On December 25, 2021, Plaintiff was referred for a psychiatric evaluation after multiple visits to the emergency room with chest pain and negative medical workups. During his evaluation, Plaintiff was upset about being referred to psychiatry, complained that his blood pressure "has been at a dangerously high level" and of being at "high risk for stroke and heart attack," and that his father died in 2012 from a cardiac event. (Doc. 60-4 at p. 33). Plaintiff was on three antihypertension medications (Metoprolol, Amlodipine, and Lisinopril) and a statin; his recent lipid profile and metabolic panel were within normal limits except for two mild deviations; and a cardiology appointment was pending. Plaintiff declined to consider a selective serotonin reuptake inhibitor ("SSRI") for risk of depression and expressed that, apart from his medical concerns, he was "fine" and denied intense sadness, anhedonia, hopelessness, helplessness, or suicidal or homicidal ideation. Plaintiff denied a history of symptoms consistent with coronary artery disease and minimized the syncopal episodes or loss of consciousness reported by staff. There was no evidence or reports of psychosis or mania, but Plaintiff appeared cooperative, defensive, suspicious, and guarded, with his mood "all over the place," his affect "irritable," his judgment fair and his insight poor. *Id*. As a result of Plaintiff's evaluation, a psychiatrist determined that a somatic symptom disorder was a "strong possibility." *Id*. Somatic symptom disorder is characterized by an extreme focus on physical symptoms, such as pain or fatigue, which causes major emotional distress and problems functioning.

From December 25-31, 2021, Plaintiff's blood pressure was checked in the morning and afternoon or evening, reading 110/68 and 130/80; 120/64 and 126/82; 136/85 and 136/84; 128/80 and 142/84; 122/86 and 138/82; 124/84 and 126/80; and 142/80 and 130/70, respectively.

On January 5, 2022, security staff called Plaintiff to the HCU for a blood pressure check, but Plaintiff refused.

On January 7, 2022, Plaintiff went to the Prairie Heart Institute in Springfield, Illinois for a consultation with Advanced Practice Registered Nurse Andrea Bloodworth ("Bloodworth") regarding hypertension. In her progress notes, Bloodworth noted Plaintiff had a history of hypertension and a family history of strokes, congestive heart failure, and coronary artery disease, with his father dying from cardiac arrest. Bloodworth noted Plaintiff had been suffering from hypertension for more than a year, back discomfort, and had four syncopal episodes since November 14, 2021, in which he did not remember anything prior to losing consciousness. Plaintiff's blood pressure was uncontrolled during the visit with Bloodworth; she recommended adding 5mg of Amlodipine at night to the 5mg of Amlodipine and 20mg of Lisinopril he already took in the morning and the 50mg of Metoprolol he already took in the evening, as well as having Plaintiff wear a cardiac monitor for thirty days. Bloodworth noted that, "[b]ased on his EKG tracings from November, I suspect that given his uncontrolled hypertension, [Plaintiff] is suffering from some degree of left ventricular hypertrophy. And given his recent episodes of syncope, hypertrophic cardiomyopathy is also being considered. I will order an echocardiogram to be performed prior to his upcoming appointment with me in February." (Doc. 60-10 at p. 30). Bloodworth's instructions included, "[g]iven his EKG suggesting left ventricular hypertrophy as well as his uncontrolled hypertension for greater than 3 months, I recommend [Plaintiff] undergo an echocardiogram to assess for any diastolic dysfunction and to assess the severity of his probable left ventricular hypertrophy." *Id*. at p. 33.

Plaintiff bases his assertion that unchecked blood pressure caused irreparable damage to his heart valve in part upon a medical record reporting his January 7, 2022, visit with Bloodworth,

12

but that report does not state that left ventricular hypertrophy is irreparable damage. (Doc. 60-1 at 134:17–135:19). Plaintiff acknowledged Bloodworth's report did not support his claim of irreparable damage, testifying, "I think science, science tells you that. I mean, you're right, in the report, but science tell you it's unrepairable." *Id*. at 135:13-15.

On January 9, 2022, Plaintiff came to the medication line stating that he had pain in his chest/side area and was sent to the HCU. At the HCU, he reported his pain was on his left side area, not the chest area; he was not feeling nauseated or short of breath; and it felt like his heart skipped a beat. He was wearing a cardiac monitor, and a nurse checked his blood pressure, which read 130/80.

On January 10, 2022, medical staff members were summoned to Plaintiff's housing unit after he lost consciousness. The nurse who responded checked Plaintiff's vitals; his temperature was 98.4 degrees, his pulse was 62; his blood pressure was 160/80; he was alert and oriented; and his pupils were equal in size, reactive, light-sensitive, and accommodating. No apparent injury was noted. In response to questioning, Plaintiff stated, "I'm good," "don't need to go to HCU." (Doc. 60-3 at p. 29).

On January 11, 2022, Plaintiff passed out while speaking to a security guard, fell to the ground, and hit his head. Plaintiff's vital signs were taken, with his temperature at 97.3, pulse at 73, and blood pressure at 142/90. Plaintiff told medical staff his head hurt, stood up with no difficulties, and walked back to his room.

On January 12, 2022, Plaintiff was called to the HCU to discuss his recent health issues with Defendant Hogan. Plaintiff's blood pressure was 129/76; he was wearing his cardiac monitor; and he reported wearing it during his recent syncopal episodes. The cardiologist's office was contacted regarding the episodes. Defendant Hogan spoke with Plaintiff about his various

symptoms, including short-term memory issues, chest heaviness with walking, weakness/fatigue for the past two months that had intensified, and pressure on the right side of Plaintiff's head that "feels like it will push his eye out." *Id*. at p. 27. Defendant Hogan told Plaintiff he could stay in the infirmary due to his concerns, but Plaintiff declined.

On January 13, 2022, Plaintiff went to the HCU and was informed his cardiac report was negative thus far and that he would see an eye doctor for the reported pressure behind his eye.

On January 22, 2022, Plaintiff saw a psychiatrist for a follow-up visit.

On February 8, 2022, a doctor at St. John's Hospital in Springfield, Illinois reviewed Plaintiff's echocardiogram and determined his right and left ventricular size and volume were normal, as was the left ventricular and right ventricular systolic function. Plaintiff was sent to the Prairie Heart Institute for care the same day. Bloodworth reported that Plaintiff's recent echocardiogram "does not appear to demonstrate left ventricular hypertrophy," that "there is no significant LVH on his echocardiogram performed today," that "there are no significant valvular abnormalities," and that Plaintiff "has had no more syncopal episodes since his gabapentin, lorazepam, and tramadol were discontinued." (Doc. 60-10 at pp. 20-21).

On February 12, 2022, a doctor at Prairie Heart Institute reviewed the results of Plaintiff's cardiac monitor from January 7, 2022, through February 5, 2022, and found his heart was functioning normally.

On March 17, 2022, Plaintiff saw an optometrist regarding blurry vision. The optometrist referred Plaintiff to the emergency department. A doctor at Sarah D. Culbertson Memorial Hospital examined Plaintiff, and a nurse subsequently reported no findings during Plaintiff's visit.

On June 15, 2022, Plaintiff came to the HCU requesting to speak with Defendant Hogan, asked to learn more about pseudo seizures and stress management, expressed concern that nursing

staff think he is "faking it," and refused to see psychiatry by stating, "I don't want to be diagnosed with anything. I am trying to get out of here." (Doc. 60-2 at p. 82).

On August 25, 2022, Defendant Hogan was notified that a neurologist declined to see Plaintiff after reviewing his case, including 156 pages of notes, CT scans, and a brain MRI.

On September 16, 2022, Plaintiff saw a doctor at Prairie Cardiovascular Consultants concerning his syncope episode. The doctor recommended that "[w]ith his normal left ventricular systolic function and previously unremarkable arrhythmia monitor, I suspect his syncopal episodes are noncardiac in etiology." (Doc. 60-9 at p. 44).

### Defendant Twila Batterton

Plaintiff is not sure of the exact dates he encountered Defendant RN Batterton. Plaintiff claims Defendant Batterton was deliberately indifferent when she did not contact a doctor when Plaintiff's blood pressure was at a certain level and when she did not check his blood pressure when he had a PRN order from a doctor to check it. A "PRN" order from a doctor or nurse to check a resident's blood pressure means to check it as needed. (Doc. 60-13 at ¶ 24). A "PRN" order does not mean HCU staff must check a resident's blood pressure on demand by the resident. *Id.* Plaintiff also complained that Defendant Batterton checked his blood pressure too many times. (Doc. 60-1 at 95:5-21). Plaintiff testified he could not say whether Defendant Batterton's actions or inactions harmed him. (Doc. 60-1 at 96:19-97:7).

Based on her review of Plaintiff's HCU records, Defendant Batterton did not encounter or provide health care to Plaintiff from August 1, 2021, through January 31, 2022. Defendant Batterton charted that Plaintiff was transported to Sarah D. Culbertson Memorial Hospital on October 3, 2022, and to Prairie Heart Institute on January 7, 2022, and February 8, 2022. (Doc. 60-12).

15

**Defendant Lisa Brown**

Plaintiff does not know the exact dates when he encountered Defendant LPN Brown. Plaintiff named Brown as a Defendant because she allegedly did not check Plaintiff's blood pressure when he requested her to check it. Plaintiff also alleges Defendant Brown falsely said he refused to see the doctor or go to the HCU.

Based on her review of Plaintiff's HCU records, Defendant Brown did not encounter or provide medical care to Plaintiff from August 1, 2021, through January 31, 2022. (Doc. 60-13 at ¶ 21). The only entry in Plaintiff's medical records regarding Defendant Brown during this period, was when she charted that Plaintiff refused to come for sick call at 10:20 a.m. on November 16, 2021. *Id.* at ¶¶ 20, 23.

**Defendant Mindy Griffin**

Plaintiff testified he named LPN Griffin as a Defendant because she did not take his blood pressure when he requested and refused to check it four times. (Doc. 60-1 at 105:17-22; 109:5-11). Plaintiff does not know the exact dates when he encountered Defendant Griffin. Plaintiff claims Defendant Griffin sometimes did not take his blood pressure and oxygen when he was to take certain medication and then would say, "Oh, well, you can take [the medication] or you don't have to take it[.]" *Id.* at 107:4–108:5. Based on her review of Plaintiff's HCU records, Defendant Griffin did not provide medical care to Plaintiff from August 1, 2021, through January 31, 2022. (Doc. 60-14 at ¶ 20).

**Defendant Heather Hogan**

Plaintiff named Director of Nursing Heather Hogan as a Defendant based upon her staff allegedly not responding appropriately. Plaintiff alleges Defendant Hogan did not take action when he informed her that her staff was not providing care or monitoring his condition. Plaintiff

complained to Defendant Hogan that her staff would take multiple blood pressure readings until they got a desired number. According to Defendant Hogan, nursing staff routinely allowed a resident to rest before taking the resident's blood pressure to ensure a true reading, and taking a blood-pressure reading in both arms allows a physician to see the entire picture when giving an update on a patient's condition. (Doc. 60-15 at ¶ 32).

Plaintiff also alleges Defendant Hogan interfered with and impeded his treatment, including influencing a nurse practitioner that some of his ailments were in his head and altering treatment plans, recommendations, and orders, such as changing Tylenol to Motrin. (Doc. 60-1 at 111:4-15, 112:16-113:9). Plaintiff alleges Defendant Hogan discontinued his PRN blood-pressure order, which then was restored. *Id*. at 110:20–111:3. Plaintiff alleges Defendant Hogan discontinued the PRN blood-pressure order Bloodworth issued. *Id.* at 111:16–112:3.

Based on her review of Plaintiff's HCU records, Defendant Hogan encountered Plaintiff on three occasions from August 1, 2021, through January 31, 2022. (Doc. 60-15 at ¶ 21). On December 14, 2021, Defendant Hogan called Plaintiff to the HCU to discuss his ongoing health concerns. *Id.* at ¶ 22. She noted Plaintiff was alert and oriented, and his heart tones were strong. Plaintiff reported he felt a "little better" but was concerned about having a stroke or heart attack. Defendant Hogan reviewed his prior laboratory test results, electrocardiograms, and doctor visits. Defendant Hogan informed Plaintiff he would see the onsite doctor on Monday, and she encouraged Plaintiff to alert nursing immediately with any issues.

On January 12, 2022, Defendant Hogan again called Plaintiff to the HCU to discuss his recent health issues. *Id.* at ¶ 23. Plaintiff's blood pressure was 129/76, and he was wearing a heart monitor for thirty days as directed. Plaintiff reported he was wearing the monitor during his syncopal episodes. Defendant Hogan contacted the cardiologist's office regarding the syncopal

episodes. Defendant Hogan spoke to Plaintiff at length about his various symptoms, including short-term memory issues, chest heaviness with walking, pressure on the right side of his head that "feels like it will push his eye out," and weakness and fatigue for two months that had "intensified." *Id.* When asked about the syncopal episodes, Plaintiff reported remembering nothing until waking up and feeling dizzy afterward. Plaintiff reported the cardiology appointment revealed some probable left ventricular hypertrophy due to high blood pressure. Defendant Hogan offered to allow Plaintiff to stay in the infirmary, but he declined.

On January 13, 2022, Defendant Hogan called Plaintiff to the HCU and informed him that his cardiac report was negative thus far and that Plaintiff was to see an eye doctor for his report of pressure behind his eye. *Id.* at ¶ 24.

On June 15, 2022, Plaintiff went the HCU and requested to talk to Defendant Hogan about pseudo seizures and stress management and expressed concern that nursing staff think he is "faking it." *Id.* at ¶ 28. Plaintiff refused to see Psychology and said, "I don't want to be diagnosed with anything. I am trying to get out of here." *Id*.

Defendant Hogan attended many of Plaintiff's health care appointments with him to ensure continuity of care and to advocate for him, as Plaintiff continually complained about his medical care. *Id.* at ¶ 38. According to Defendant Hogan, she used her medical judgment in providing care and treatment to Plaintiff based on his presentation and her medical knowledge. *Id.* at ¶ 39.

### *Defendant Lucinda McKenna*

Plaintiff does not know the exact dates when he encountered Defendant LPN McKenna. Plaintiff alleges Defendant McKenna allowed another nurse to persuade her from performing her job duties as a nurse. (Doc. 60-1 at 114:3-8). Plaintiff claims Defendant McKenna said his blood pressure was too high and that she needed to contact the doctor, but Defendant Batterton allegedly

18

said, "No, we're not calling the doctor." *Id.* at 114:14–115:18. Plaintiff claims he named McKenna as a Defendant only because she knew of his PRN blood pressure order but did not follow it. Based on her review of Plaintiff's HCU records, Defendant McKenna did not encounter or provide medical care to Plaintiff from August 1, 2021, through January 31, 2022. (Doc. 60-16 at ¶ 20).

### Defendant Michelle Shults

Plaintiff does not know the exact dates when he encountered Defendant Shults. Plaintiff states he passed out on November 19, 2021, and hit his head on the floor. (Doc. 60-1 at 64:21-65:1; 66:12-20). Plaintiff claims he was simply picked up off the floor, put in a room, given Tylenol, and was not taken to the HCU for testing. *Id.* at 66:21-67:6. Plaintiff thinks the nurse who responded to the fall was Defendant Shults, but she was not present when he first regained consciousness. *Id.* at 67:9-10; 68:10-15; 71:7-9. Plaintiff alleges Defendant Shults both did and did not ask whether Plaintiff had hit his head. *Id.* at 67:9–11; 68:16–69:4. Plaintiff alleges Defendant Shults should have taken him to the HCU, examined him after the incident, and performed certain tests. *Id.* at 70:6-11; 73:11-16; 75:1-3; 116:20-117:9.

Plaintiff alleges Defendant Hogan told him that when he had a blood pressure and cardiovascular episode, he was to be taken to the HCU and checked to see if he was having a stroke by being given a variety of tests. *Id.* at 67:23-68:5; 74:11-19. Plaintiff also alleges Defendant Shults did not call him to the HCU when his blood pressure was elevated. *Id.* at 117:15-22.

Based on her review of Plaintiff's HCU records, Defendant Shults only provided medical care to Plaintiff once between August 1, 2021, and January 31, 2022. (Doc. 60-17 at ¶ 21). On December 13, 2021, Defendant Shults responded to a call from security staff and found Plaintiff sitting in a chair crying after he passed out and hit his head. *Id.* at ¶ 22. Defendant Shults checked Plaintiff's vitals; his temperature was 98 degrees, pulse was 64 beats per minute, and blood

pressure was 162/78. Plaintiff was alert and oriented and his pupils were equally round, reactive

to light, and accommodating. *Id.* Defendant Shults checked Plaintiff's hand grip and leg strength,

which were equal. Plaintiff denied any loss of consciousness, nausea, or vomiting. Defendant

Shults observed no redness or swelling at the back of Plaintiff's head. Defendant Shults notified

Dr. Sood of the incident and noted Plaintiff would be monitored through the night. According to

Defendant Schults, she used her medical judgment in providing care and treatment to Plaintiff

based on his presentation and her medical knowledge. *Id.* at ¶ 26.

### *Defendant Sara Watson*

Plaintiff does not know the exact dates when he encountered Defendant RN Watson.

Plaintiff alleges he named Watson as a Defendant because of her attitude, his encounters with her

were inappropriate, she refused to take his blood pressure multiple times, and she accused him of

faking his condition. (Doc. 60-1 at 118:8-21; 121:6-10; 123:6-13).

Defendant Watson did not encounter or provide medical care to Plaintiff from August 1,

2021, through January 31, 2022. (Doc. 60-18 at ¶ 20). As a result, Defendant Watson did not

document that Plaintiff reported dizziness, headaches, shortness of breath, or high blood pressure.

*Id.* at ¶ 21.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for

summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence

of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am.*

*Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must

construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In order to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

## ANALYSIS

Because Plaintiff is a civil detainee, the Due Process Clause of the Fourteenth Amendment governs his medical care claims. *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008); *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). Plaintiff alleges Defendants violated his Fourteenth Amendment rights when they allegedly refused to respond when he reported dizziness, headaches, and shortness of breath, failed to monitor his blood pressure, and did not notify a doctor when his blood pressure was too high from August 1, 2021, through January 31, 2022. (Doc. 8 at pp. 3-6). Defendants argue they are entitled to summary judgment because Plaintiff did not suffer from an objectively serious medical need, and they were not deliberately indifferent to Plaintiff's medical needs. (Doc. 60).

**I.**     **Plaintiff suffered from an objectively serious medical need.**

First, Defendants assert that Plaintiff's reported dizziness, headaches, and shortness of breath, along with their alleged refusal to monitor his blood pressure or to notify a doctor when his blood pressure was high, did not constitute an objectively serious medical condition. (Doc. 60 at pp. 45-48).

21

A serious medical need is one diagnosed by a physician as mandating treatment or one so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512 (7th Cir. 2005). A medical need is serious where failing to treat the prisoner's condition could cause further significant injury or the unnecessary and wanton infliction of pain. *See Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).

Defendants assert that dizziness, headaches, and shortness of breath are relatively minor conditions and not objectively serious. *Kimbrough v. Stutleen*, 411 F. App'x 882, 884 (7th Cir. 2011) (dizziness and shortness of breath); *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (dizziness, headaches, and breathing problems). Here, however, the evidence shows that Plaintiff underwent multiple electrocardiograms, was referred to cardiology specialists, diagnosed with hypertension, prescribed medications, and his blood pressure was monitored frequently. High blood pressure, or hypertension, is a serious medical condition. *See Jackson v. Pollion*, 733 F.3d 786, 789-90 (7th Cir. 2013). The Court finds there is sufficient evidence that Plaintiff suffered from an objectively serious medical condition.

## II.     Defendants were not deliberately indifferent to Plaintiff's serious medical needs.

Under the Fourteenth Amendment, Defendants' conduct is assessed using the objective reasonableness standard. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2019). To prove Defendants failed to provide reasonable medical care, Plaintiff must first show that Defendants acted purposefully, knowingly, or recklessly. *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353). If Defendants were "aware that their actions would be harmful, then they acted purposefully or knowingly; if they were not necessarily aware but nevertheless strongly suspected that their actions would lead to harmful results, then they acted recklessly." *Pittman by & through Hamilton v. Cnty. of Madison, Illinois*, 970 F.3d 823, 828 (7th

Cir. 2020). "A showing of negligence or even gross negligence will not suffice." *McCann*, 909 F.3d at 886. A difference in opinion over the course of treatment "suggests only negligence, which is not a constitutional violation." *Bell v. Blaesing*, 844 F. App'x 924, 926 (7th Cir. 2021). Significantly, "[w]ithout any medical evidence of inadequate treatment, a prisoner's self-serving opinion of the quality of treatment is insufficient to raise a genuine issue of material fact." *Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2002).

Second, Plaintiff must show the challenged conduct was objectively reasonable. "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann*, 909 F.3d at 886. Treatment decisions made by qualified professionals are presumptively valid and entitled to deference, unless the evidence shows the decision constituted such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision upon such judgment. *Seidler v. Liberty Healthcare Corp.*, No. 20-4258, 2023 WL 2653346, at *6 (C.D. Ill. Mar. 27, 2023).

Objective unreasonableness under the Fourteenth Amendment cannot be shown through the actions of a collective group, as Plaintiff attempts to do here. *See Shields v. Illinois Dept. of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014). Instead, Plaintiff must present enough evidence for a jury to find that a particular Defendant was personally involved. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Here, many of the Defendants had limited involvement in Plaintiff's medical care. For instance, the only entry in Plaintiff's medical records regarding Defendant Brown was when she charted that Plaintiff refused to come for sick call on November 16, 2021. Similarly, Defendant

Batterton charted that Plaintiff was transported to the hospital on October 3, 2022, and to Prairie Heart Institute on January 7, 2022, and February 8, 2022.

Defendant Shults provided medical care on only one occasion when she responded to a call from security staff after Plaintiff passed out and hit his head on December 13, 2021. Defendant Shults checked Plaintiff's vitals, his eyes, hand grip, and leg strength and saw no cause for concern. Plaintiff denied any loss of consciousness, nausea, or vomiting, and Defendant Shults observed no redness or swelling at the back of Plaintiff's head. Defendant Shults notified the doctor, who ordered Plaintiff to be monitored through the night.

Plaintiff claims Defendants Watson and Griffin refused to take his blood pressure multiple times, and Defendant McKenna allegedly did not contact the doctor when Plaintiff's blood pressure was too high because Defendant Batterton told her not to. Defendants' occasional refusal to check Plaintiff's blood pressure or report his high blood pressure to a doctor does not amount to deliberate indifference. High blood pressure readings, by themselves, are insufficient to demonstrate harm to a plaintiff's medical condition. *Foote v. Lewis*, 2014 WL 202706, at *3 (N.D. Ill. 2014) (pretrial detainee). While a nurse's mistaken failure to check a plaintiff's blood pressure might constitute negligence, it does not violate the constitution. *Cf. Dickerson v. Schmitt*, No. 7:23-CV-00068, 2023 WL 3726507, at *7 (W.D. Va. May 30, 2023) ("[S]uch negligence, without more, does not violate the Eighth Amendment."); *Wethington v. Al-Shami*, No. 1:10-CV-00027-TWP, 2011 WL 6415539, at *8 (S.D. Ind. Dec. 21, 2011) ("While there is no evidence in [Plaintiff's] medical record indicating that her blood pressure and pulse were checked on October 28, 2008, any omission in monitoring caused by [Defendant's] conduct demonstrates only negligence, which does not rise to level of deliberate indifference.").

24

Plaintiff claims that Defendant Hogan interfered with his medical care by altering his treatment plans. Based on Plaintiff's HCU records, Defendant Hogan encountered Plaintiff on three occasions from August 1, 2021, through January 31, 2022. There is no evidence that Defendant Hogan was deliberately indifferent to Plaintiff's medical needs; Plaintiff's medical records show that medical staff members attended to him nearly daily for months, often taking his blood pressure three times a day. Plaintiff was prescribed numerous medications, including for high blood pressure, and his prescriptions were adjusted based upon the latest assessment of his condition. Rushville healthcare providers also sent Plaintiff to outside cardiac specialists and the local hospital.

Plaintiff has not presented any evidence that Defendants' alleged acts or omissions caused any harm or that he suffered irreparable damage to a heart valve. (Doc. 65). Plaintiff initially relied on a report from his January 7, 2022, visit with Nurse Practitioner Andrea Bloodworth of Prairie Heart Institute in support of his assertion that he suffered damage to a heart valve, but after being shown the report at his deposition, Plaintiff acknowledged it did not state there was irreparable damage. Moreover, during a subsequent visit with Bloodworth on February 8, 2022, she determined after reviewing the results from his echocardiogram, that Plaintiff had no significant valvular dysfunction and no significant left ventricular hypertrophy that could be prompting his symptoms. Based on the undisputed material facts, no reasonable jury would find that Defendants were deliberately indifferent to Plaintiff's serious medical needs. Therefore, summary judgment is granted in favor of Defendants.

**IT IS THEREFORE ORDERED:**

(1)     Defendants' Motion for Summary Judgment [60] is GRANTED. Defendants Heather Hogan, Michelle Shults, Twila Batterton, Sara Watson, Lucinda McKenna, Lisa Brown,

and Mindy Griffin are DISMISSED WITH PREJUDICE. Plaintiff takes nothing. The parties will bear their own costs. The Clerk is directed to enter judgment and close this case.

(2)     If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. FED. R. APP. P. 4(a).

(3)     If Plaintiff wishes to proceed *in forma pauperis* on appeal, his motion for leave to appeal *in forma pauperis* must identify the issues Plaintiff will present on appeal to assist the Court in determining whether the appeal is taken in good faith. *See* FED. R. APP. P. 24(a)(1)(c); *see also Celske v. Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff chooses to appeal, he will be liable for the $605.00 appellate filing fee regardless of the outcome of the appeal.

ENTERED:  6/17/2024

s/ James E. Shadid
James E. Shadid
United States District Judge

26